FILED

JUN 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

William T. Walker
1010 Peconic Place
Upper Marlboro, Maryland 20774
301-808-3589

JURY
ACTION

VS.

CASE NUMBER  1:06CV01115

JUDGE: Paul L. Friedman

John W. Snow, Secretary,
Department of the Treasury, Agency
1500 Pennsylvania Avenue, NW
Washington, DC 20220

DECK TYPE: Employment Discrimination

DATE STAMP: 06/19/2006

## COMPLAINT

**Background**

I was employed by the Department of the Treasury in February 1987, in the Office of the Comptroller of the Currency (OCC), Information Technology Systems Department (ITS), as a Computer specialist. Despite being well-qualified and performing at a high-level for 12 years, I was continuously denied opportunities for promotions. After being passed over for 29 positions that were posted and filled in 1998, I filed a formal EEO complaint in May 1999 because I was convinced that I had been passed over because of my race, sex, and age.

1

Prior to 1998, there were approximately 185 full-time positions in the ITS department, but there were only two black team leaders (one female and one male).  The two black team leaders were the highest-level blacks in the department.

I was hired by the OCC in 1987 to implement a data warehousing program and was told prior to being hired that my position would become a team leader position.  However, after performing at a high-level for more than 12 years and receiving superior ratings, I was denied a promotion to team leader and the opportunity to service as acting team leader for data warehousing during the ITS restructuring period (1997 thru 1998).  Several of the white employees who received promotions to team leaders were allowed to act in the positions prior to the posting of the 1998 announcements, and later promoted to team leader positions after the jobs were posted.

In order to present my best case, I would like to request a jury trial.  Below is a list of allegations which I would like for the Court to consider.  Allegations 1 - 9 listed below were in my May 14, 1999 formal EEO complaint.  Each allegation and explanation is stated as it was in my May 14, 1999, EEO complaint.  Allegations 10 - 15 were filed in an EEO complaint

on May 10, 2001, because I felt that management were retaliating

against me for filing my original EEO complaint in May 14, 1999.

**Allegation 1 - Continuing denial of promotion using patterns and practices of discrimination based on race, sex, and age**

I have been working at the Comptroller of the Currency (OCC) for

more than 12 years dating back to February 1987.  Despite being

well-qualified and performing at a high-level for 12 years, I

have yet to be promoted.  My performance ratings for the past

four years prior to my EEO complaint were superior, and my

performance ratings for the other eight years were superior and

fully satisfactory.  I have been well-qualified for an OC-16

level position at the OCC since 1991, yet, I have continuously

been denied a promotion and equal pay.  I feel that I have been

discriminated against because of my race, sex, and age.  I was

hired by Dave Nichols and Mark Olsen.  Mark Olsen was the

director of the User Support division, one of three divisions in

the office of Information Resources Management (IRM).  The other

two divisions in IRM were the Applications Development division

(ADD) and the Systems Support division (SSD).  Dave Nichols

worked for Mark Olsen as head of the Information Center.  I

worked directly for Dave Nichols.

3

All of the white employees who were in the User Support division when I started in 1987, have been promoted and most of them have been promoted several times since 1987.  I was told by Dave Nichols prior to accepting my position with the OCC that my position had promotion potential to team leader or OC-16 position providing I performed well.  That was the main reason that I took a lateral from my previous employer to accept the job with the OCC.  However, after 12 years of performing at a high-level, I have yet to be promoted.

I was hired to setup an ad hoc query program for IRM.  The implementation of an ad hoc query program basically involved implementing databases and reporting systems which would allow OCC end-users agency-wide to perform their own ad hoc queries and reporting, rather than, depending on the Applications Development division (ADD) for ad hoc reporting.  I was the only employee in IRM hired to perform the ad hoc query (currently called data warehousing) function as their primary responsibility.

After working for about two years at the OCC and having implemented several successful projects, management decided to give me additional resources to perform my function.  However, I

4

was transferred to the Applications Development division, along
with the two FTEs assigned to my function.  Price Waterhouse
concluded a study and analysis of the functions in IRM during
the third quarter of 1990, and recommended that my function be
elevated to a team leader position, but, the director of ADD
(Craig Hackett) reallocated the FTEs to other functions and
refused to provide sufficient support to my projects.  In
effect, this prevented me form being promoted to a team leader
position.  I believe that Craig Hackett discriminated against me
because of my race, sex, and age when he refused to provide
proper support to my function and denied me the opportunity to
be promoted to an OC-16 position.

I worked in ADD from February 1991 through September 1992 under
Craig Hackett as the division director.  Even though OCC end-
users and Price Waterhouse were demanding that ADD assign more
support to the ad hoc reporting function, Craig Hackett, refused
to allocate proper resources or backup for the ad hoc reporting
function.  Since I felt that my function was not being supported
by Craig Hackett, I asked to be transferred back to the User
Support Division which had been renamed to the Information
Systems Coordination (ISC) division with Robert Smith replacing

5

Mark Olsen as director. I was transferred back to ISC in September 1992.

Craig Hackett was removed from his position as Director of the Applications Development division during 1994 because of incompetence and discriminating practices which he had condoned for many years. Two blacks, one male and one female, were promoted to team leader positions shortly after Craig Hackett was removed. I believe that Craig Hackett and other IRM managers had established a pattern and practice of discrimination in IRM based on race, sex, and age prior to me working for the OCC that continues to exist.

I applied for three positions during the period of January 1992 through January 1993. The job announcements were SW-92-7, 92-08(SE), and 92-114. These positions were at OC-14/15 positions. I made the best-qualified lists for all three positions, but all three positions were filled by white applicants who I felt were less qualified. All three applicants had less experience in information technology than I, therefore, I believe that I was discriminated against and not selected for either position because of my race, sex, and age.

6

I started working in ISC in September 1992 and worked there
until the reorganization of IRM in November 1996. Several white
employees' positions were upgraded or promoted to OC-14/15
during that period. Data analyst positions were upgraded to OC-
14 positions, several LAN administrator positions were upgraded
to OC-14s and OC-15s. In other divisions in IRM, programming,
system programming and data base administration positions were
updated to OC-14s and OC-16 positions. Many of these positions
were upgraded without posting announcements or allowing
competition. But my position remained at the level which I was
hired at in 1987, OC-13, even though my responsibilities had
increased. I believe that race, sex, and age were factors in my
position not being upgraded like the other employees.

Also, during this time period, ADD promoted two white employees
after two failed attempts to develop an ad hoc reporting system
for Shared National Credits (SNC) to OC-15 and OC-14 positions.
I developed an ad hoc query system for SNC which was used by
end-users for at least five years. I implemented the SNC
reporting system without any resources, whereas, ADD had several
in-house staff and contractors working on their version of the
system. The Shared National Credits users still cannot perform
their own reporting using the ADD developed systems. I believe

7

that my race, sex, and age were factors in my not getting promoted after successfully implementing the SNC system.

**Statistics**

There is currently one black female and one black male team leader in Information Technology Services (ITS). There are currently approximately 185 fulltime employees in ITS consisting of 105 whites, 58 blacks, and 22 others. There are currently approximately 52 OC-14/15/16/17 positions in ITS which are non-supervisory. The total number of blacks at or above the OC-14 level is 5. My position is comparable or exceeds most of the non-supervisory positions in terms of scope and responsibility. I believe that my failure to advance was discriminatory and part of a pattern and practice of discrimination based on race, sex, and age.

**Allegation 2 - Refusal to allow me to act as team leader during the restructuring of the Information Resource Management (IRM) office during 1997 through most of 1998:**

I worked in the Information Systems Coordination (ISC) division under Robert Smith until he took a buyout in December 1996. Lenny Reid became the acting director of ISC and in April 1997, Lenny became acting deputy comptroller of IRM under a restructure of IRM. The restructured organization was renamed Information Technology Services (ITS). Lenny Reid is a close

8

friend of Craig Hackett and seems to share Craig Hackett's discriminatory attitude and practices.

Lenny discriminated against me by refusing to allow me to act as team leader throughout 1997, however, he allowed other white employees in my unit to act as team leaders who I believe to be less qualified than I. I had more experience in information technology than the white employees that he allowed to act as team leaders. The white employees who were allowed to act as team leaders were eventually promoted to team leaders once the positions became official. I believe that by allowing white employees to serve as acting team leaders and denying me the same opportunity is in violation of the OCC's merit selection process. I feel that Lenny's refusal to allow me to act as team leader was discriminatory based on race, sex, and age. I believe that Lenny discriminated against me because he felt that it would better qualify me for the team leader positions when they were eventually announced.

**Allegation 3 - Refusal to upgrade my position to the level of other employees in and outside of IRM with similar functions and responsibilities**

I started working for the OCC and IRM in February 1987. During the period February 1987 through December 1996, prior to Lenny becoming acting director of ISC, many of the positions in IRM

9

were upgraded from OC-13 to OC-14. I discussed this issue with Robert Smith just before he took a buyout in December 1996. Robert said that he felt that my position should be upgraded and would discuss that with Lenny Reid prior to leaving the agency.

I discussed upgrading my position with Lenny Reid on several occasions during the first and second quarters of 1997, but Lenny told me to wait until the re-organization became official. Lenny also told me that no other employee positions in the department would be upgraded before the re-organization was official. However, I learned that Lenny had approved the upgrading of positions for two other employees in my unit. Both employees were promoted during 1997 prior to the re-organization becoming official.

There were no criteria or selection process for upgrading most of the positions in IRM, however, I believe that the process of upgrading positions in IRM was discriminatory and created a pattern and practice of discrimination. I believe that my race, sex, and age were factors in Lenny's refusal to upgrade my position.

**Allegation 4 - Attempt to force me to take a buyout by harassing me**

10

On several occasions, while meeting with Lenny Reid, he

suggested that I should think about taking a buyout. This

comment usually occurred during meetings where we discussed

upgrading my position to the level of similar positions in and

outside the department. I believe that my race, sex, and age

were factors in Lenny discriminating against me by continually

suggesting that I take a buyout.


During August and September of 1997, Lenny complained about me

going across the street to have lunch, even though, it is common

for OCC employees to go across the street to eat lunch. Lenny

also accused me of not being at my desk, and taking unofficial

leave. However, when I asked for specific dates and times he

refused to tell me. I believe that Lenny discriminated against

me because of my race, sex, and age.


During the period 1997 through the first quarter of 1998, Lenny

consistently refused to let me serve as team leader for data

warehousing but he consistently suggested that I take other

dead-end or lateral assignments in and out of the IT department.

I felt that Lenny had already pre-selected the data warehousing

function for someone else in the department and wanted me out of

11

the way.  I believe that Lenny's actions were based on race, sex, and age.

Lenny consistently refused to provide backup for my projects and attempted to assign me to other projects without proper resources for the current projects that I was responsible for. I believe that Lenny discriminated against me because of my race, sex, and age by not providing proper backup for my projects.

Lenny refused to sign essential training for me until a week or so before the training class started while other people in my unit did not have that problem.  I believe that my race, sex, and age were factors in Lenny discriminating and harassing me in this manner.

**Allegation 5 - Refusal to act as data warehousing team leader, and provide proper project support by Charlie Wright**

On April 8, 1998, Lenny Reid assigned me to the Information Services division where Charlie Wright was acting division director.  I met with Charlie on April 16, 1998, to discuss my function.  I suggested that my function should be a team leader function in his division but Charlie refused to let me act as team leader for the data warehousing function.  I met with

Charlie Wright again on June 20, 1998, about serving as acting
team leader for the data warehousing function but Charlie said
that he had pre-selected Vance Kane to be the data warehousing
team leader.  I believe that Charlie's pre-selection of Vance
Kane to the data warehousing team leader position is a violation
of the merit selection process.  I believe Charlie discriminated
against me by pre-selecting Vance Kane to the data warehousing
team leader position since I was not given a chance to compete
for the position.  I believe that my race, sex, and age were
factors in Charlie's discriminatory action.

I was hired to perform the data warehousing function in 1987 as
my main responsible, however, IRM management for 11 years had
consistently refused to provide the level of support recommended
by Price Waterhouse and requested by OCC end-users for my data
warehousing projects.  During the restructuring period (January
1997 through September 1998) of IRM, Lenny Reid and Charlie
Wright consistently refused to let me act as data warehousing
team leader even though I had more data warehousing experience
than anyone else in IRM.

But in June of 1998, Charlie Wright with Steve Yohai's approval
(Steve Yohai, at the time, was the newly hired Chief Information

Officer of IRM), provided in-house and contractor resources to Vance Kane to manage a data warehousing project. Even though I had performed most of the data warehousing projects in IRM for 11 years, Charlie and Steve provided proper support to Vance Kane who at the time had not managed or implemented any data warehousing projects at the OCC. I had been refused that type of support for the prior 11 years. I asked Charlie to provide resources for my current data warehousing projects but he has yet to provide me with proper resources to support my projects.

After receiving support for his data warehousing projects, and being allowed to act as team leader, Vance was promoted to team leader within six months. I believe that I was discriminated against by Charlie because I was not allowed to act as team leader even though I had more data warehousing experience than Vance. I also believe that Charlie discriminated against me by not providing proper support for my projects as he did for Vance's projects. I believe that my race, sex, and age were factors in all of the above discriminatory actions and that it shows a pattern and practice of discrimination in IRM.

**Allegation 6 - Unfair denial of promotion**

14

On June 19, 1998, I applied for three computer specialist positions under announcements 98-103E, 98-104E, and 98-105E. On October 14, 1998, I learned that I was denied a promotion in each instance. I believe that I was better qualified than most of the 30 applicants selected for positions under the above announcements because I had more experience in information technology. I believe that I was denied a promotion because of my race, sex, and age. I also believe that I was harassed or received reprisal for not taking a buyout and repeatedly asking to serve as acting team leader throughout the restructuring of IT.

Under Announcement 98-105E, Wayne Leiss was selected for one of the OC-17 positions. I believe that Wayne Leiss was pre-selected for the position because he was allowed to transfer from another department in June of 1998, just prior to the posting of the above positions even though he had a very limited background in information technology. I believe that I was better qualified for the position than Wayne Leiss because I had more experience in information technology. There were three OC-17 positions filled under announcement 98-105E. All three applicants selected were white. I believe that I was not selected because of my race, sex, and age.

Under Announcement 98-104E, eight applicants were selected

for OC-16 positions. Seven were white and one was black.

I believe that I was equally or more qualified than the

selected applicants because I have more experience. I was

told by Charlie Wright on June 20, 1998, that Vance Kane

had been pre-selected for the data warehousing team leader

position which was an OC-16 level position. Vance Kane was

given resources in June of 1998 which allowed him to act as

the team leader for data warehousing and was then selected

for an OC-16 position under Announcement 98-104E. Charlie

Wright announced in January 1999 that he had officially

appointed Vance Kane as the team leader for data

warehousing, thus, making good his pre-selection statement

that he made in our June 20, 1998, meeting.

Under Announcement 98-103E, there were 17 candidates

selected for OC-14 positions. All applicants selected were

white. I believed that I was better qualified than the

selected applicants because I have more experience.

Under Announcement 98-103E, both Brenda Finegan and

Kathleen Mahoney had only a few years of experience in

information technology. They were formal office

16

secretaries who developed personnel relationships with ITS management (Brenda Finegan is married to Eugene Finegan who was promoted to an OC-16 position under Announcement 98-104E. Kathleen Mahoney is married to Vance Kane who Charlie Wright had told me had been pre-selected for an OC-16 position under Announcement 98-104E.)

**Allegation 7 - Denial of a fair performance rating**

On October 16, 1998, I met with Judy Morrison, Team Leader for Customer Support, the unit where I had worked in throughout most of the restructuring period. Judy Morrison rated me as fully satisfactory. I had received a rating of superior for the previous four years or rating periods by other supervisors. I believe that Judy Morrison lowered my rating in order for management to justify overlooking me for a promotion. In addition, management rating pattern and practice in IRM was to give superior and outstanding ratings to favorites in order to justify assigning them to acting team leader positions or pre-selecting them for promotions. Even though, I worked under Judy Morrison in Customer Support, my function was different from the other functions performed in Customer Support. Customer Support dealt primarily with distribution of PCs and certain software throughout the agency.

17

My function dealt with data warehousing.  Management refused to let me act as the data warehousing team leader or a separate group during restructuring, therefore, I was assigned to the Customer Support team, even though, my function was totally  different from everyone else in the group.   Judy Morrison had virtually no communication with me during the year that I worked under her (July 1997 - June 1998).  She had no real understanding of my projects but yet she decided to lower my rating from superior to fully satisfactory.  Management refused to give me proper resources for my projects even though my workload increased.  I believe that lowering my rating was discriminatory and that my race, sex, and age were factors.

**Allegation 8 - Ongoing harassments from management**

During the restructuring of IRM from January 1997 through most of 1998, Lenny was very reluctant to support my projects but was very supportive of projects managed by other employees.  I had to even constantly ask him to approve of training required for me to manage my projects but other employees training requests were immediately approved.  I view these actions by Lenny to be harassments and reprisals for me not taking a buyout.  I also feel that my race, sex, and age were also factors.

Charlie Wright, my current division director, has not allowed me to procure on trial basis new software which would allow me to provide better support to my customer base, while at the same time, he has allowed other ITS personnel to procure new and more expensive software related to their projects. In effect, this has hindered me from utilizing new software which could improve the services that I provide to my customers. I also believe that Charlie is discriminating against me by doing this and I also believe that this is a form of harassment in which my race, sex, and age are factors.

**Allegation 9 - Continuing use of a merit promotion process which discriminates based on race, sex, and age**

I believe that the ITS management team uses a merit promotion process which discriminates based on race, sex, and age. In the case of the three announcements (98-105E, 98-104E, and 98-103E) discussed in Allegation 6, management ensured that their pre-selected candidates were selected by allowing them to act in positions with promotional opportunity, writing generic KSAs (knowledge, skills and abilities), assigning panel members who knew who the pre-selected candidates were, misrepresentation of experience on application, and having the Chief Information Officer (CIO) to make the selection, all to avoid promoting blacks.

19

Most of the pre-selected white candidates selected for

positions at the OC-16 and above were allowed to act in the

position prior to being selected, however, I was not

allowed to act in positions even though I was better

qualified than the pre-selected white candidates because I

had more experience.

I believe that management wrote generic KSAs for the above

positions in order to ensure that their pre-selected

candidates, who were less qualified, made the best-

qualified list.

There were a total of 17 panel members serving on the

panels for the OC-14/16/17 positions, although, Charlie

Wright who told me  on June 20, 1998, that he had pre-

selected Vance Kane for one of the OC-16 positions served

on two panels, one for the OC-16 and OC-17 position.  All

of the 17 panel members, except 3, worked under the

selecting officer (Steve Yohai).

I was eliminated from the competition for a position under

Announcement 98-103E (OC-14s) after being interviewed by

the telephone-interview panel which consisted of three

people.  Two members on the telephone-interview panel were

ITS managers who worked directly for Charlie Wright.  The

other member of the panel was a friend of ITS management.

I believe that all three of the panel members knew that all

of the positions had been pre-selected and they rated the

telephone interviews accordingly.

Under Announcement 98-104E (OC-16), I was eliminated from

competition for a position by the application-review.  The

application-review panel reviewed and determined which

applications would be submitted to the telephone-interview

panel.  All members of the application-review panel for

this announcement were ITS managers who worked directly or

had worked directly for Charlie Wright.  Charlie Wright was

also a member of the telephone-interview panel for this

announcement.  Vance Kane, who Charlie Wright told me had

been pre-selected for a position under this announcement,

was selected as Charlie had said.  I believe that all

members on the application-review panel knew that all of

the positions under this announcement were pre-selected and

rated the applications accordingly.

Under Announcement 98-105E (OC-17), I was again eliminated

from competition by the application-review panel which

21

consisted of two members.  Both panel members were ITS managers who worked under the selecting official.  Charlie Wright was also a member of the telephone-interview panel for this announcement.  I believe that both panel members knew who the pre-selected candidates were and rated the applications accordingly.

The KSAs in each of the announcements counted for over 50% of the total points, however, the KSAs were written very generic and similar for all three positions.  I received 15 out of 16 points for KSAs under Announcement 98-103E (OC-14), 9 out of 15 points for KSAs under Announcement 98-104 (OC-16), and 16 out of 30 for KSAs under Announcement 98-105E (OC-17).  I believe that I received more points from the panel in Announcement 98-103E (OC-14) because the application-review panel did not consist solely of ITS managers.  The other two application-review panels for announcements 98-104E and 98-105E consisted solely of ITS managers who ensured that the pre-selected applicant's applications were rated higher.

Most of the positions for the OC-14 under Announcement 98-103E were under Charlie Wright who on June 20, 1998, told me that he had pre-selected Vance Kane for one of the OC-16

positions.    The members of the panel that determined which
applicants would be interviewed consisted of two people who
worked directly for Charlie Wright, and the third member
was a friend of Charlie Wright and ITS management.
I believe that some of the pre-selected white applicants,
such as, Wayne Leiss, may have misrepresented their IT
experiences on their applications.    Wayne Leiss was an
economist who was transferred to the ITS department in June
1998, just before the positions were posted but was
selected for one of the OC-17 positions.    Brenda Finegan
and Kathleen Mahoney were selected to OC-14 positions but
they only had a few years of experience in IT.    They both
were former ITS secretaries who married ITS managers.

Steve Yohai, CIO, was the selection official in all three
of the above announcements.    I believe that Steve was very
much aware of who the pre-selected candidates were and made
his selections accordingly.

I believe that the Information Technology Services division
has continuously used this type of merit promotion process
to continuously discriminate against me based on race, age,
and sex, and against other blacks by using patterns and
practices of discrimination.

**Retaliation complaints**

Since filing my original EEO complaint on May 14, 1999,

management continued to harass me, and I filed an

additional EEO complaint on May 10, 2001.  I also believe

that these instances of harassment are based on race, sex,

and age, in addition to retaliation.

**Allegation 10 - Management refusal to approve of training
for me on May 21, 2000 and April 24, 2001 was harassment
based on race, sex, age, and retaliation.**

Management refused to let me take training which was

directly related to my primary responsibility while

approving training for other employees.

**Allegation 11 - Management harassed me about signing my
performance appraisal and expectations on August 2, 2000
and September 6, 2000 because of race, sex, age, and
retaliation.**

Management threatened me with disciplinary actions on

August 2, 2000 and September 6, 2000, because I refused to

sign my performance appraisal and expectations.  Management

told me that I was not required to sign but yet they kept

harassing me to sign.  Management did not harass other

employees about signing their performance appraisals and

expectations when they chose not to sign.

**Allegation 12 - Management harassed me by placing a letter
of reprimand in my personnel folder on November 14, 2000
because of my race, sex, age, and retaliation.**

Management placed a letter of reprimand in my personnel

folder on November 14, 2000 because I refused to sign my

performance appraisal and expectations.  I believe that

management placed a letter of reprimand in my personnel

folder to retaliate against me for filing my original EEO

complaint.  I believe that management actions were based on

race, sex, age, in addition to retaliation.

**Allegation 13 - Management harassed me by continuously
refusing to provide the same level of support to my
projects as they provided to other employees on my team or
division because of my race, sex, age, and retaliation.**

**Allegation 14 - Management harassed me on May 4, 2001, by
denying me a detail while approving details for other
employees because of my race, sex, age, and retaliation.**

Management refused to allow me to go on a detail for about

two years.

**Allegation 15 - Since filing my EEO complaint on May 14,
1999, management has continued to deny me a promotion for
over 19 years, and continues to try to force me to leave
the Agency.**

I have applied for over 50 positions and made the best-

qualified list on most of them, however, management has

refused to promote me.  Management on several occasions

have attempted to force me to take positions outside of the

Agency.

**The main managers who I believe were most responsible for**

**discriminating against me were Lenny Reid, Steve Yahai, and**

**Charlie Wright.**

25

**Relief Requested:**

- Retroactive pay from June 1991 to October 1998 at OC-16 with all subsequent step increases for which I would be otherwise qualified.

- Retroactive pay from October 1998 to present at OC-17 with all subsequent step increases for which I would be otherwise qualified.

- Promotion to OC-17 or NB-7.

- Compensatory Damages - $300,000.00.

- Attorney fees and other costs incurred to obtain relief.

- Guarantee that no reprisals will be taken against me.

- Any other equitable and legal relief to which I am entitled.


Respectfully Submitted,

*William J. Walker*

William T. Walker
1010 Peconic Place
Upper Marlboro, MD. 20774
301-808-3589