UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WILLIAM T. WALKER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>HENRY M. PAULSON, JR., )<br>)<br>Secretary, U.S. Department of )<br>the Treasury, )<br>)<br>Defendant. )<br>) | Civil Action No.06-1115(PLF) |

### PLAINTIFF'S OPPOSITION MOTION TO DEFENDANT'S MOTION FOR PARTIAL DISMISSAL AND TO STRIKE

Plaintiff in opposition to the Defendant's Motion for Partial Dismissal and to Strike states as follows:

### ALLEGATION 1 CLAIMS

Plaintiff believes that all claims under Allegation 1 (Complaint at 3-8) should be investigated because they are related and constitute a continuing denial of promotion by the Office of Information Resources Management (IRM) using patterns and practices of discrimination based on race, sex, and age. All claims under Allegation 1 were against the same office (IRM), division (Applications Development Division (ADD)) and manager (Craig Hackett). However, at

RECEIVED
OCT - 6 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

the time that the claims occurred, Plaintiff was not convinced that these acts were discriminatory.

Plaintiff had discussed with management on several different occasions during the period of 1991 through 1998 as to why his position had not been upgraded to the level of similar positions in IRM. IRM management consistently told Plaintiff that his function would be eventually upgraded or Plaintiff would have a chance to compete for a promotion in the future. So, Plaintiff tried to have patience, trust management and be a team player. Since management said that plaintiff would be eventually promoted, Plaintiff at the time did not view the claims under Allegation 1 to be discriminatory.

Prior to 1998 there were only a few competitive positions posted in IRM. But after the Plaintiff was denied a promotion under one of the 30 positions that were filled under the three vacancy announcements posted in 1998, Plaintiff was convinced that he was being discriminated against because of his race, sex, and age (Allegation 6, Complaint at 15-17). Plaintiff was also convinced that IRM had been operating a continuing merit promotion system which discriminates based on race, sex, and age (Allegation 9, Compliant at 19-23).

Contrary to Defendant's claim number (3) on Page 1 of her memorandum of points and authorities, Robert Smith did not refuse to upgrade Plaintiff's position between 1992 and 1996. Robert Smith consistently told Plaintiff during that period that his function would be updated or Plaintiff would have a chance to compete for a promotion. However, several white employee positions were upgraded during 1996 (Complaint at 7). The Plaintiff met with Robert Smith just prior to his retirement in December 1996 to discuss upgrading Plaintiff's position. Robert Smith told Plaintiff that he would meet with Lenny Reid, new Acting Director of ISC, to recommend that Plaintiff's position be upgraded (Complaint at 10).

Plaintiff was hired in 1987 to work in the User Support Division (USD) to perform the data warehousing function which was a new function for IRM. Mark Olsen was the director of USD, and Robert Smith also worked in USD (Complaint at 3). During the third quarter of 1990, Price Waterhouse recommended that the Plaintiff's function be elevated to a team leader position. In February 1991, IRM and USD provided Plaintiff with two additional full-time equivalent (FTE) positions to be assigned to his function (Plaintiff took a lateral to come to work for the OCC in 1987, but was promised a promotion if he could implement

successful data warehousing projects for USD. By 1991, Plaintiff had implemented several successful data warehousing projects. Based on the Plaintiff's successfully implemented projects and the Price Waterhouse study, IRM assigned two FTE positions to USD to work on the data warehousing function with the Plaintiff. Thus, the Plaintiff's function was now equivalent to a team leader function in IRM, and the Plaintiff's position should have been upgraded or competed (Complaint at 4). However, in February 1991, the Plaintiff was transferred to ADD.

    The director of ADD (Craig Hackett) reallocated the two FTE positions to other functions and refused to provide the Plaintiff with additional resources as recommend by Price Waterhouse and IRM, thus, preventing the Plaintiff from being promoted to a team leader position. Shortly after the Plaintiff was transferred to ADD in February 1991, Robert Smith replaced Mark Olsen as Director of USD. Since Craig Hackett refused to provide the Plaintiff with proper resource, the Plaintiff talked to Robert Smith about being transferred back to USD.

    Robert Smith informed the Plaintiff that if he accepted a transfer back to USD that his position would be eventually upgraded to a team leader position. So, the Plaintiff accepted a transfer back to USD to work under

Robert Smith until he retired in December 1996. Craig Hackett was removed from his position as Director of ADD during 1994 because of incompetence and discriminating practices which he had condoned for many years (Complaint at 5-6).

The Defendant's statement on Page 8 of her memorandum of points and authorities that the Plaintiff's claims were filed against at least five different individuals and at least three different divisions is not accurate. The three positions (Complaint at 6) that the Plaintiff applied for during the period of January 1992 through January 1993 were all under IRM (renamed to the Office of Information Technology Services (ITS)), and ADD (renamed to the Information Services Division (ISD)). Craig Hackett was the director of ADD at the time, and was also the director of ADD in 1991 when he took away the Plaintiff's two FTE positions that were assigned by IRM and USD.

The 30 positions filled under the three vacancy announcements in 1998 were also in the same office (ITS) and division (ISD). Steve Yohai was the Chief Information Officer of ITS, and the division director of ISD was Charlie Wright. Charlie Wright was the recommending official, and Steve Yohai was the selecting official in all

30 positions that were competed for in 1998 (Allegation 9, Complaint at 19-23).

Prior to the filling of the 30 positions in 1998, there were only one black female and one black male team leader in ITS which at the time had approximately 185 fulltime employees (Complaint at 8). During the investigation of the Plaintiff's EEO complaint by the OCC, the Plaintiff asked the OCC for a report breaking down ITS employees by grade-level and race prior to 1998, but the OCC refused. After the 30 positions were filled in 1998, at least seven black employees filed EEO complaints against ITS management (Steve Yohai and Charlie Wright). Both Steve Yohai and Charlie Wright were eventually forced to resign because of the EEO complaints filed against them. Plaintiff believes that the removal of steve Yohai and Charlie Wright was an involuntary admission of quilt of discrimination by the Agency.

## ALLEGATIONS 2 - 5, 8, CLAIMS

Defendants claims (4) - (7) listed on Page 2 of her memorandum of points and authorities document are part of Allegation 2 (Complaint at 8-9), Allegation 3 (Complaint 3 at 9-10), Allegation 4 (Complaint at 10-12), Allegation 5 (Complaint at 12-14), and Allegation 8 (Complaint at 18-19).

6

During the restructuring of IRM (renamed ITS) from 1997 through 1998, ITS management (Lenny Reid) refused to allow Plaintiff to act as data warehousing team leader, but allowed other less qualified white employees to act as team leaders (Allegation 2, Complaint at 8-9). Lenny Reid refused to upgrade Plaintiff's position during 1997, even though he upgraded other positions in IRM (Allegation 3, Complaint at 9-10). Robert Smith met with Lenny Reid prior to retiring in December 1996 to recommend that Plaintiff's position be upgraded. But, Lenny Reid refused and told Plaintiff that he would have to wait until the re-organization became official. Lenny Reid also attempted to force Plaintiff into taking a buyout by harassing him (Allegation 4, Complaint at 10-12).

Plaintiff was transferred from ISC to ADD (renamed ISD) again in April 1998 where Charlie Wright was acting director. Plaintiff asked Charlie about acting as data warehousing team leader, but he refused. In June 1998, Plaintiff learned that Charlie Wright had pre-selected a white employee for the data warehousing team leader position. The employee had not implemented any data warehousing projects at the OCC, but was allowed to act as data warehousing team leader and provided with resources (Allegation 5, Complaint at 12-14).

7

Lenny Reid was not successful at harassing Plaintiff into taking a buyout during the summer of 1997 (Allegation 4, Complaint at 10-12), so he and Charlie Wright continued to harass Plaintiff by not providing support (including software to support Plaintiff's customers) and reluctance to approve of training requests (Allegation 8, Complaint at 18-19).

Plaintiff believes that all claims under allegations 1-5, and 8, should be investigated because they are related and constitute a continuing denial of promotion by the Office of Information Resources Management (IRM) using patterns and practices of discrimination based on race, sex, and age. However, at the time that the claims occurred, Plaintiff was not convinced that these acts were discriminatory until he was passed over for 30 positions in October 1998.

**ALLEGATION 9 IS NOT REDUNDANT TO ALLEGATION 6**

I believe that the ITS management team used a merit promotion process which discriminated based on race, sex, and age. In the case of the 30 positions filled in 1998, management ensured that their pre-selected candidates were selected by allowing them to act in positions with promotional opportunity, writing generic knowledge, skills and abilities (KSAs), assigning panel members who knew who

the pre-selected candidates were, misrepresentation of experience on application, having Charlie Wright(ISD Director), recommending applicants, and Steve Yohai (CIO) making the selections, all to avoid promoting blacks (Allegation 9, Complaint 19).

Contrary to Defendant's statements (Page 1 in her dismissal motion, and Page 9-10 in her memorandum of points and authorities) to strike the claims raised in Allegation 9 (Complaint at 19-23) because they are repetitive and redundant of other claims in Allegation 6 (Complaint 14-17), Plaintiff believes that claims in Allegation 9 are different from claims in Allegation 6.  In Allegation 9, Plaintiff stated that the merit promotion process used by ITS in 1998 discriminated based on race, sex, and age. Plaintiff described the merit promotion process in detail to show how it was used to discriminate against blacks. Plaintiff hoped that the merit promotion process would be changed in order to correct the problem.  Plaintiff's claims in Allegation 6 contested the selection of less qualified white applicants for the 30 positions posted in 1998.

## ALLIEGATION 15 NOT REDUNDANT TO ALLEGATION 6

Allegation 15 (Complaint at 25) covers the period of 1987 through 2006.  Plaintiff filed an EEO complaint in May

9

14, 1999 and a retaliatory EEO complaint on May 10, 2001. ITS management has continued to refuse to promote Plaintiff, and on several occasions have attempted to force Plaintiff to take positions outside of the Agency. After Steve Yohai and Charlie Wright were forced to leave ITS because of their discriminatory practices, ITS hired new management in 2002. One of the goals of the new management was to improve the percentages of blacks and other minorities in ITS. Plaintiff met with the new management and was told that he could not be promoted in ITS because of his EEO complaint. ITS management offered to assist Plaintiff in finding a position outside of the Agency. ITS management is still continuing to retaliate against Plaintiff for filing his EEO complaint in May 1999.

Contrary to Defendant's statements, Allegation 15 is not the same as Allegation 6 because the claims in Allegation 15 are ongoing retaliation claims that the Plaintiff has been experiencing since he filed his original EEO complaint in May 1999. Allegation 6 contested the selection of less qualified white applicants for the 30 positions posted in 1998.

## CONCLUSION

In summary, Plaintiff believes that all 15 of his allegations should be accepted and investigated because it

shows a series of related discriminating acts or the maintenance of a discriminatory system or policy which constitutes a continuing violation. Plaintiff worked in the same office providing the same service. The bias of one supervisor was passed on by the record of the smaller actions of discrimination. Even though, several acts occurred during the period 1991 through 1998 which Plaintiff thought were unfair, Plaintiff was not convinced until October 1998 when Plaintiff was passed over for 30 positions that Plaintiff was being discriminated against because of his race, sex, and age.

                                      Respectfully Submitted,

                                      *William T. Walker*
                                      William T. Walker
                                      1010 Peconic Place
                                      Upper Marlboro, MD. 20774
                                      301-808-3589

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on the 6th day of October, 2006, I mailed a copy of the foregoing Plaintiff's Opposition Motion to Defendant's Motion for Partial Dismissal and to Strike to:

Kathleen Konopka
Assistant U.S. Attorney General
Judiciary Center Building
555 4th Street, NW
Room E4412
Washington, DC 20001

*William J. Walker*
William T. Walker
1010 Peconic Place
Upper Marlboro, Md. 20774
301-808-3589